Argued July 25, affirmed in part, reversed in part and remanded
December 18, 1978, reconsideration denied March 13, 1979

In the Matter of the Estate of George Ian Hunter,
Deceased.

HUNTER, *Respondent—Cross-Appellant,*

*v.*

CRAFT, *Appellant—Cross-Respondent,*
HUNTER, *Respondent—Cross-Appellant,*
GREENE et al, *Heirs and Devisees.*

(No. P-48-76, CA 9254)

588 P2d 617

Thomas C. Howser, Ashland, argued the cause for appellant—cross-respondent. With him on the briefs were Ronald K. Cue and Cottle, Howser & Hampton, Ashland.

Joel B. Reeder, Medford, argued the cause and filed the briefs for respondent—cross-appellant Louise E. Hunter.

Karen C. Allan, Medford, argued the cause for respondent—cross-appellant Clinton R. Hunter. With her on the brief was Frohnmayer, Deatherage, Foster & Purdy, Medford.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

RICHARDSON, J.

## RICHARDSON, J.

This suit involves a will contest in which Clifford Craft, as executor, petitioned for probate of the will of decedent George Hunter. Louise Moon Hunter, decedent's widow, petitioned to have the will declared revoked by operation of ORS 112.305 and a distribution of the estate to her as the sole intestate heir. Clinton Hunter filed a petition asserting the will was revoked by operation of ORS 112.305 and that he was the son of decedent and entitled to share in the intestate distribution.

The court decreed that the will was revoked, that the decedent died intestate and that Clinton Hunter was not the son of decedent.

The executor appeals refusal of the court to admit the will to probate. Louise Moon Hunter cross-appeals the award of fees and costs to the executor. Clinton Hunter cross-appeals the denial of his petition to share in distribution of the estate.

Decedent died an elderly man, leaving the contested will and a substantial estate. He married his first wife in 1927, after they had lived together for several years. Clinton Hunter was born to decedent's first wife in 1916, prior to their marriage. The Massachusetts birth certificate listed the mother by her maiden name and a person other than decedent as the father. Decedent's first wife died in 1971, and in the fall of 1972 Louise Moon moved into decedent's house as a housekeeper, companion and nurse.

On April 17, 1975, decedent executed a deed and bill of sale conveying his house and its contents to Louise Moon with a covenant, written into the deed, that she agreed to care for him for the remainder of his life. The deed was placed in escrow with instructions for the escrow agent to record the deed upon decedent's death, provided Louise Moon had fulfilled the terms of the covenant. Decedent executed the contested will on June 6, 1975. Decedent and Louise Moon were married

on December 2, 1975. Decedent died on March 16, 1976.

The executor's first assignment of error asserts that the deed held in escrow with a covenant for future services was a written contract that made provision for the spouse and prevented revocation of decedent's last will.

ORS 112.305 states:

"A will is revoked by the subsequent marriage of the testator if the testator is survived by his spouse, unless:

"(1) The will evidences an intent that it not be revoked by the subsequent marriage or was drafted under circumstances establishing that it was in contemplation of the marriage; or

"(2) The testator and his spouse entered into a written contract before the marriage that either makes provision for the spouse or provides that the spouse is to have no rights in the estate of the testator."

For the purposes of discussion we assume that the deed held in escrow containing the covenant satisfies the statutory requisite of a written contract.

■■ The evident purpose behind the revocation statute is to protect a spouse from accidental disinheritance by a will executed prior to marriage. The statute contemplates that in some instances a testator may wish a limitation of spousal inheritance. In light of the general legislative purpose, the exceptions to revocation by marriage must be read narrowly.

In reaching its conclusion, the trial court stated that any contract within the purview of ORS 112.305(2), of necessity, must be between parties contemplating marriage. Although subsection (1), which refers to the will itself, does include the language "in contemplation of the marriage," and subsection (2) does not, we conclude that the latter implies such contemplation. The statute simply would not make sense otherwise if the language "makes provision for the spouse," were to require anything less than an anticipated marriage to the other party at the

time of the contract. To illustrate further, the executor's argument carried to its logical end would have any contract for services between parties who were not considering marriage but who later became espoused, to be within ORS 112.305(2). That surely was not the intent of the legislature.

Further, the second clause of subsection (2) manifestly relates to parties anticipating marriage, for it is impossible to imagine a situation where two persons who are not anticipating marriage, would enter into an agreement in which one of them renounced conjugal rights in the other's estate. Similarly, this rationale applies to a contract for provision for a spouse because there would be no duty otherwise to provide for one unrelated to the testator.

Finally, the statute demands that the provision be for the spouse. To hold that a will is revoked on the mere basis of a contract between parties who later become husband and wife, without regard to either's intent at the time of the contract, would do nothing to further, and in fact would work to negate, the policy underlying the statute.

■ We read the language of ORS 112.305(2) implicitly to require that there have been a contemplation of marriage at the time the contract was entered into.

Applying this interpretation of the statute to the facts of this case, we find that the deed to Louise Moon Hunter from George I. Hunter was executed and placed in escrow before the parties to it entertained any serious thoughts of marriage. The record indicates that although marriage had been discussed prior to executing the deed, it was only in jest. Decedent had made a proposal of marriage to a previous housekeeper. Further, there was nothing said to the attorney who prepared the deed regarding any possible marriage, and the first time any serious intent to marry became apparent was approximately six months after the deed was executed. Finally, the terms

of the escrow and the covenant in the deed show that the essence of that agreement was an exchange for services and a guarantee of future care, rather than any provision for an intended spouse.

■ We hold that, at the time of the deposit of the deed in escrow, there was no contemplation of marriage between Louise Moon and decedent. Consequently, the deed does not satisfy the requirements of ORS 112.305(2). Since Louise Moon Hunter, the spouse of decedent, survived him, the will validly executed before the marriage was revoked by operation of law.

■ The executor next asserts, if the court finds the will was revoked by decedent's marriage to Louise Moon, that she exerted undue influence to prevent execution of a new will. The essence of this argument supposes that Louise Moon had a conscious objective to obtain a large share of decedent's estate. In carrying out that objective she first married him, then by a combination of factors, prevented him from executing a will to dispose of his estate as originally intended. The allegation of undue influence is not sustained by the evidence. The trial court in its memorandum opinion exhaustively reviewed the facts it determined were proven and concluded there was a lack of undue influence. Our review of the record leads us to the same conclusion.

In his third claim of error the executor alleges that decedent was incompetent at the time of his marriage to Louise Moon and the marriage is voidable under ORS 107.015. The trial court ruled the issue could not be raised by the executor in this proceeding.

■■ In *Dibble v. Meyer*, 203 Or 541, 278 P2d 901, 280 P2d 765 (1955), the Supreme Court held that a suit to annul a marriage on the ground of incompetence was abated on the death of the person claimed to be under the disability. A marriage contracted when either party is incompetent, or when consent to marry is obtained by fraud, is voidable, not void *ab initio.* ORS 106.030. The death of a party to a marriage terminates

the marriage and a suit for annulment does not survive the death. *Dibble v. Meyer, supra.*

■ The executor argues that *Dibble v. Meyer, supra,* is no longer applicable because the statute applied was repealed in 1971.[1] ORS 107.015 adopted the substance of the statutes applied in *Dibble* but deleted the requirement that the suit be brought by the party laboring under the disability. The executor argues that the change in the statute allows any person to challenge the marriage. On the contrary, the amended statute simply allows either party to seek annulment of the marriage on the ground of incompetence or fraud, not just the party laboring under the disability. ORS 107.015 provides for annulment of a voidable marriage. An annulment proceeding must be initiated by one of the parties to the marriage. In addition to the validity of the marriage, a court in an annulment proceeding, must determine other applicable issues such as child custody, child and spouse support and property division. There is little practical difference in these respects between a suit for annulment and a suit for dissolution of a marriage. It follows, a third party cannot institute a suit for annulment.

■ The change in the statute did not alter the basic holding of *Dibble v. Meyer* that a voidable marriage is valid until terminated and that the death of one of the parties terminates the marriage. Since the marriage in this case had not been voided by a decree prior to the

---

[1]The former ORS 107.020, construed in *Dibble v. Meyer,* 203 Or 541, 278 P2d 901, 280 P2d 765 (1955), provided:

"A marriage shall not be declared void for any of the causes specified in ORS 106.030 except at the suit or claim of the party laboring under the disability or upon whom the force or fraud was imposed or practiced.* * *"

The former ORS 106.030 provided:

"When either party to a marriage is incapable of making such contract or consenting thereto for want of legal age or sufficient understanding, or when the consent of either party is obtained by force or fraud, such marriage shall be void from the time it is so declared by decree of a court having jurisdiction thereof."

decedent's death, it was valid at the time he died and is not subject to collateral attack in these proceedings.

In his final claim of error the executor contends the will was executed by decedent in contemplation of his marriage to Louise Moon and therefore it was not revoked by the marriage. ORS 112.305(1) states a will is revoked by a subsequent marriage unless:

> "The will evidences an intent that it not be revoked by the subsequent marriage or was drafted under circumstances establishing that it was in contemplation of the marriage * * *."

The will contained no language that would bring it within the purview of the first part of subsection (1).

The will was executed June 6, 1975, and the marriage took place on December 2, 1975. There was conflicting evidence as to when the marriage plans were made. The trial court, which had an opportunity to hear the witnesses and assess their credibility, concluded the first serious discussion of marriage occurred after the will was drafted. We concur in the trial court's finding.

Since we hold the marriage was valid and the will was revoked by the marriage, we approach the claim of Clinton Hunter that he should share in the intestate distribution as the son of the decedent.

In his cross-appeal he claims the court erred in finding he was not decedent's son and was therefore not entitled to share in the estate. He argues that by operation of ORS 112.105(2)(b) he is an heir. That statute provides:

> "(2) For all purposes of intestate succession and for those purposes only, before the relationship of father and child and other relationships dependent upon the establishment of paternity shall be given effect under subsection (1) of this section:
>
> "(a) The paternity of the child shall have been established under ORS 109.070 during the lifetime of the child or;

[ 552 ]

"(b) The father shall have acknowledged himself to be the father in writing signed by him during the lifetime of the child."

Clinton Hunter argues that decedent repeatedly acknowledged in signed writings that Clinton Hunter was his son and therefore under ORS 112.105(2)(b) he has established heirship. Louise Hunter contends there is other evidence that someone other than decedent was Clinton Hunter's father. It is necessary to detail some of the facts.

Clinton Hunter was born in 1916 in Massachusetts. His birth certificate, filed in that state, lists his name as Clinton Edwards, his mother as Julia Kinander, the maiden name of decedent's first wife, and his father as Brinton D. Edwards. Under Massachusetts law at the time of Clinton Hunter's birth, the birth certificate listed the maiden name of the mother and the name of the father if the two were married. If the child was born out of wedlock, the name of the father was not to be included in the absence of a written request by both parents. Rev Laws Mass, ch 29, § 1 (1902). It may be assumed Brinton Edwards was listed as the father because: (1) he was married to Julia Kinander; or (2) Brinton Edwards and Kinander were not married but filed a written request that he be listed as the father; or (3) the statute was not precisely followed; or (4) Brinton Edwards was listed as the father without his knowledge.

Clinton Hunter's earliest memories of a family involved his mother and decedent living together. There appears as an exhibit a family portrait of decedent, Clinton, and his mother, taken when Clinton was a small child. He overheard a conversation in 1927, when he was eleven years old, indicating they had just become married. He was always known as decedent's son; and decedent, in the numerous wills he executed during his lifetime, always listed Clinton Hunter as his son.

Decedent and Julia Kinander were married in 1927. The application for marriage license disclosed she had two previous marriages which ended in divorce. She signed the application as Julia K. E. Thrige. Her maiden name, as disclosed on Clinton's birth certificate, was Julia C. Kinander. Louise Moon Hunter argues this signature, which included the two initials of "K" and "E," stand for her maiden name Kinander and her first married name Edwards, Thrige being her second married name.

Clinton Hunter's mother and decedent lived together for a period of time prior to their marriage in 1927. One of decedent's medical records discloses that he told his doctor he had been married to his first wife for 56 years. Since she died in 1971, this would indicate a marriage in about 1915. The marriage certificate indicates the formal marriage took place in 1927. Clinton Hunter, who was eleven years old at the time, recalls the marriage. Prior to that time his only memory of a family included his mother and decedent. This would indicate decedent lived with Clinton Hunter's mother for a number of years prior to the marriage. Decedent's statement to the doctor in all probability was a statement that he had lived together with Julia Kinander as husband and wife for 56 years and that they cohabitated in this relationship at the time of Clinton Hunter's birth.

In essence Clinton Hunter's contention is that ORS 112.105(2)(b) provides a right to share in the intestate distribution, independent of a formal establishment of paternity. On the other hand, contestant Louise Moon Hunter contends the statute sets forth an alternate method of determining paternity which is not conclusive in the face of evidence the decedent was not the biological father of the child.

It is not clear what is intended by ORS 112.105(2)(b). A literal reading of the statute would indicate that any writing by a decedent acknowledging that he was the father would suffice to entitle the

person to claim he was the child for intestate distribution. Did the legislature intend that such acknowledgment would preclude evidence showing, for example, that the person making the claim was not in fact biologically related to decedent? Alternatively, did the legislature intend under this statute to recognize contracts to adopt provided there is a writing? *See Schultz v. First Nat. Bk. of Portland et al,* 220 Or 350, 348 P2d 22, 81 ALR 2d 1121 (1970). We do not reach these issues. The decedent acknowledged that he was the father in a formal and dramatic manner. He executed several wills and codicils expressly acknowledging Clinton Hunter as his son and bequeathing him a pittance of one dollar from the substantial estate. It is undisputed that at the time these wills and codicils were executed decedent was competent and not subjected to undue influence.

█ Furthermore the preponderance of the evidence indicates decedent was the biological father. Although the birth certificate recites that a former husband of Clinton Hunter's mother was the father, the weight of the evidence indicates at the time of conception Clinton Hunter's mother was cohabitating with decedent. The recent medical record indicates decedent told his doctor he had been married to his former wife for 56 years. Although the marriage documents show a marriage in 1927, decedent's statement to his doctor indicates he lived in a husband and wife relationship with Clinton Hunter's mother since 1915, a year prior to Clinton Hunter's birth. There is an abundance of testimony that throughout Clinton Hunter's lifetime both decedent and his former wife referred to him as their son. There is testimony that in later years there was little love between Clinton Hunter and decedent. However, rather than disclaim parentage decedent acknowledged heirship in his will and showed his displeasure by bequeathing one dollar to Clinton Hunter. We conclude the evidence is sufficient to establish that Clinton Hunter is the son of decedent for purposes of intestate succession.

The cross-appeal of Louise Moon Hunter challenges the award of fees and costs to the executor. She argues he defended the will knowing there had been a subsequent marriage which revoked it.

■■ It is the duty of the executor to defend the will provided there are reasonable grounds to believe it is valid, *In re Shepherd's Estate,* 152 Or 15, 41 P2d 444, 49 P2d 448 (1935), and he is entitled to reasonable fees and costs in doing so. Any such defense must not be undertaken in bad faith or merely to expedite the executor's personal interest in the outcome.

■ This case concerned complex legal issues and contested fact questions. The executor had no interest in the litigation other than to defend the will. We conclude his actions were taken in good faith and affirm the award of fees and costs.

In summary, we find the will was revoked by the valid marriage of decedent and the estate should pass by intestate succession. We reverse the court's finding that Clinton Hunter is not entitled to share in the intestate distribution and affirm the award of fees and costs to the executor.

Affirmed in part, reversed in part and remanded.